## ZURICH GEN. ACCIDENT & LIABILITY INS. CO., Limited, et al. v. HILL.

### No. 6650.

Court of Civil Appeals of Texas. Texarkana.
Sept. 11, 1952.

Rehearing Denied Oct. 16, 1952.

Brown & Brown, Atchley & Vance, Robert S. Vance, Texarkana, for appellants.

John D. Raffaelli, Texarkana, for appellee.

WILLIAMS, Justice.

In this consolidated action to recover death benefits under the Texas Workmen's Compensation Act, Title 130, Vernon's Ann.Civ.St. art. 8306 et seq., appellee Retha Hill and appellant Bronney Hill, each claim to be the common-law wife of Goodley Hill at the time he was accidentally killed on May 25, 1950. Appellant Zurich General Accident & Liability Insurance Company, the insurance carrier, reasserts here that neither woman was the common-law wife. Agreed stipulation of facts filed in the trial court eliminated all issues except as to which alleged wife, if either, the compensation was payable. Based upon the stipulated facts and the jury findings favorable to Retha and adversely to Bronney, the former was awarded judgment.

The jury found that "Goodley Hill and Retha Patterson entered into an agreement to take each other from thence forth as husband and wife during their lives"; that "pursuant to such agreement they cohabited together as husband and wife" as the term "cohabit" was in the charge defined; and "pursuant to such agreement the two held themselves out to the public as man and wife." In response to special issue No. 4, the jury found that J. D. Patterson (former husband of Retha) "had absented himself from his usual place of residence for seven years successively before such agreement." The jury found that Goodley Hill and Bronney Howell did not "on or about June 11, 1949, enter into an agreement to take each other from thence forth as husband and wife"; did not cohabit together nor hold each other out to the public as husband and wife.

This appeal asserts the alleged insufficiency of the evidence to support the various findings. The zeal, loyalty and efforts that the attorneys have expended in behalf of their respective clients in this litigation constitute a fine testimonial of the characteristics most common among the legal profession. This skill, resourcefulness, energy and ingenuity with which a large area in Texas, Arkansas and other points were combed in search of evidence, pro and con, have resulted in the production of a large record.

Goodley and Bronney were united in a ceremonial marriage at Magnolia, Arkansas in 1912. Seven children were born to this union, the youngest being twenty-four years of age at the time of the trial. Their married life was somewhat rocky as Goodley was prone to wander off after other skirts. After several separations, Goodley obtained a divorce from her in March, 1935, in the Chancery Court of Columbia County, Arkansas. Bronney later married one Ben Howell, who shortly thereafter died. She then followed her children to Michigan where she lived with them on and off through the years. After above divorce

was granted, Goodley married a woman named Clara, who died June 8, 1949, near Richardson, Texas. Goodley owns a home in Texarkana. The record does not disclose when or how he acquired this home. It was Bronney's testimony that she had returned from Michigan and had been living in Waldo, Arkansas for several months at the time Clara died; that while Clara then lay a corpse Goodley came to see her at Waldo and there begged her to come back to him; that when she hesitated he threatened her and finally she agreed to come back but not until Clara had been "funeralized"; that he gave her $10 and hired a truck to move her things to his home. She had returned to Arkansas and had been there for several months at the time Goodley was killed. She claimed she had gone there to nurse a sick daughter. Other evidence is to the effect that about Christmas in 1949, Goodley told her he was having another woman to come live with him; that this news caused a rumpus with a remark that if such took place that "only the chickens would be left to tell about it"; that she loaded up with clothes and merchandise from a store where Goodley had credit and "leff out."

Retha moved into the home during the Christmas season of 1949 and continued to live with him in the home until after his death when Bronney and several of the grown children appeared on the scene and took up residence there. It appears from Retha's testimony that about this time Bronney began to play "tit-tat-too" with an ice pick. This exhibition with the presence of Bronney's children and a letter from some white person all combined to cause Retha to seek a cooler climate and she "leff" out. It appears that some small industrial policies showed up. Bronney produced two such policies which she claims to have found "in a clean pair of khakis of Goodley down in a clean lard can in the smokehouse." In these she was named as his wife, as beneficiary. Another or other such policies described Bronney and another the beneficiaries as friends. The latter were found under a glass in a secret drawer to a dresser according to Retha. The respective dates, amounts or who had

applied for the respective policies are undisclosed. It is unnecessary to further detail the evidence with respect to Bronney's claim other than to point out that she produced evidence to support her claim that she and Goodley had agreed to become husband and wife.

Evidence in suport of Retha's claim is to the effect that she and Goodley became acquainted near Redwater many years ago and along in December, 1949, they had met up again at a local bus station in Texarkana and from that time on he courted her, visited her at her home at Hope, Arkansas, asked her several times to be his wife and asked her mother for her. When she finally consented, Goodley furnished transportation to move her things to his home in Texarkana during December, 1949. It was further her testimony that she cooked and kept house; that she cultivated the garden; often times carried his lunch to him where he worked and stayed with him every day as his wife until he was killed. Goodley introduced Retha to various people as his new wife, including a Mr. Grimes, the foreman at the plant over Goodley, and told him "he was glad to have somebody do for him" and that "he wanted me on his payroll as his wife." Goodley introduced her to the grocer as his wife and "had my name put down there to get groceries and anything else I wanted and to let me have it." The two visited in the area as husband and wife and were out together in his automobile in Texarkana. Above testimony given by Retha finds support in the testimony of the grocer, neighbors and acquaintances. Other testimony introduced is to the effect that Bronney had said that some of her children had called on Goodley about Christmas, 1949, to see if Goodley was going to remarry her, but he was too drunk to get anything out of him. Other testimony is to the effect that after Bronney left out Goodley was "crying because Bronney had stolen Clara's things and had slipped off, and that he cursed Bronney and said that she had better not come back."

■■ It is readily apparent from above details and characteristics of the evidence, to which much could be added, that findings in support of the claim of either woman or

findings which would have denied the claims of both would find support in the evidence. "It is not the prerogative of the appellate court to pass upon the weight of the testimony nor to determine in whose favor it predominates * * *. An appellate court looks to the evidence on the trial to see whether such evidence is sufficient to justify the submission of the issues to the jury and whether it is sufficient to sustain the facts found by the jury." 3B Tex.Jur., Appeal and Error, Secs. 939, 940. As stated there, "the true test is that made by the jury, upon first hand evidence, adduced before them from living witnesses whose credibility, and the weight to be given their testimony was determinable by the jury." Above rules when applied to this record will not warrant this court to disturb the jury findings here.

With respect to the claim of Retha that she was his common law wife which the jury sustained under hereinabove recited findings, both appellants assert the court erred in refusing their respective motions for an instructed verdict, because: (1) Retha having admitted on the witness stand that she and Goodley were not husband and wife, that she is bound by such admission; and (2) that "Retha having been previously legally married and the evidence not showing that said marriage was ever dissolved by divorce or death of the first spouse, she could not contract for or consummate a common law marriage."

On cross-examination Retha answered in response to questions propounded to her that "we didn't have a license"; "we never married"; "he talked about getting a license and we talked about getting married off and on"; "he bought my ring and we intended to marry that Saturday when he got killed on Thursday before." In response to further questions, namely: "You were just living together on a trial and if you found you were suited, you intended to get a license and have a legal marriage," she answered, "Yes, sir"; "You were not married to him?" A. "No, sir." "With all this asking you to marry him, you never did?" A. "No, sir."

On redirect examination she was asked if when they went to living together that

they were just trying it out on a trial and if they were suited to each other they would get married, she answered, "That ain't what I did. I went there to be his wife, just what I said"; "No, I wasn't going to try him out, I was going to be his wife"; "I wasn't trying him out, I went there as his wife and was his wife all the time I was living with him"; and "we had an agreement to become man and wife before we moved together." Bronney related her first conversation had with Retha in the home after Goodley's death, a part of which in Bronney's words are as follows: "She had done come on down in the kitchen while Willie was talking to me and I went on down in the kitchen where she was, and I said, 'Are you Goodley's wife?' just that very way, and she said, 'Yes, I am Goodley's wife; I am Goodley's wife.' I said, 'You is?' and she said, 'Yes, I am Goodley's wife.' I said, 'You said you are Goodley's wife?' and I said 'show me the license. I ain't been away from here long enough. I know Goodley's ways.' And she said, 'I don't have to show you nothing.' I said, 'All right, I know Goodley aren't married to you. I have not been away long enough.' She said, 'I am his wife all right.'"

In Stanolind Oil & Gas Company v. State, 136 Tex. 5, 145 S.W.2d 569, 570, by our Supreme Court, citing many authorities and in City of Waco v. Thralls, Tex.Civ. App., 172 S.W.2d 142, citing many decisions, the well established rule here urged by appellants reads, "* * * that where a litigant admits positive and definite facts, which if true would defeat his right to recover, and such statements or admissions are not subsequently modified or explained by him so as to show that he was mistaken, although testifying in good faith, he is conclusively bound by such admissions, and cannot successfully complain if the court directs a verdict against him." Giving full weight to above rule, this record would not legally authorize the trial court to instruct a verdict against Retha, as here urged. Foster v. Woodward, Tex.Civ.App., 134 S.W.2d 417, w/r; Farr v. Kirby Lumber Corp., Tex.Civ.App., 203 S.W.2d 815; Westbrook v. Landa, Tex.Civ.App., 160

S.W.2d 232. On redirect Retha refutes the implication sought from her alleged admissions against interest. Her claim that she was his wife when she first met Bronney, hereinabove detailed, and her account of their courtship and subsequent private and public conduct is not in accord with the asserted import of her alleged admissions, but rather would imply that this uneducated woman had reference to a ceremonial marriage as distinguished from a common-law marriage.

Retha married one J. D. Patterson in the spring of 1929. Since their separation in the fall of 1929, a period of more than 21 years at the time of the trial, she has never seen nor heard from or about him and knew of no one who had seen or heard from or about him. There is no evidence or intimation to the contrary. Shortly after their marriage she and J. D. Patterson were directed to a Hot Springs, Arkansas clinic for medical treatment of an ailment evidently each was then afflicted with. It was her testimony that the disease was called "white liver." Counsel in the trial being unfamiliar with a disease under such a name and this court being furnished no medical explanation, we presume as the jury probably concluded that the disease was tuberculosis, often called the white plague. In describing the disease, she said he coughed and was spitting up blood, and the doctors ordered that they shouldn't live together any longer. She left him in that hospital and returned to her mother's home near Hope, and has never seen nor heard of him since. It appears that maybe in 1935, when she thought of marrying again, then later at another time and then again between the two trials of this cause she returned to and made inquiries about J. D. Patterson in and around Magnolia, his parents' home. She visited his father there at one time, his grandmother on another trip as well as inquired at the post office and the court house. Concisely stated, she learned that J. D. had returned from Hot Springs to his father and that after he left to enter a second hospital he had not been seen since and no one had ever heard of him; the postal people and those in the court house had no record of knowledge of him; and his people and those about "reputed" he was dead.

■ This evidence raised the presumption that J. D. Patterson was dead by reason of his absence from his home since 1929; supports the jury's finding to above special issue No. 4, and meets the requirements of art. 5541, R.C.S. of 1925, Vernon's Ann. Civ.St. art. 5541, which reads: "Any person absenting himself for seven years successively shall be presumed to be dead, unless proof be made that he was alive within that time; but an estate recovered on such presumption, if in a subsequent action or suit the person presumed to be dead shall be proved to be living, shall be restored to him with the rents and profits of the estate with legal interest during such time as he shall be deprived thereof." See McCormick and Ray Evidence, Sec. 590, p. 749, Sec. 43, p. 58.

Affirmed.